Olmsted and others *vs.* Loomis and Graves.

As a general rule, grants or reservations, in conveyances of water privileges, should be deemed absolute rather than limited to the particular objects specified; unless it clearly appears from the conveyance that the contrary was intended; such a construction being most favorable to the interests of the community.

Accordingly, although in a grant of a water-power the grantor reserved sufficient water to carry a forge and two blacksmith's bellows, yet it appearing that those objects were mentioned, not for the purpose of prescribing the use to which the water reserved should be applied, but simply as a measure of quantity; *Held*, that the grantor, and those claiming under him, had a right to apply the reserved water to another purpose, viz. the propelling of a paper mill; provided a greater quantity was not used than would be requisite for the objects particularly specified.

It is well established that a court of equity has concurrent jurisdiction with courts of law in cases of private nuisance. But it is equally well established that it is not every violation of the rights of another which may be ranked under the general head of nuisance, which will authorize the interposition of the equitable powers of the supreme court.

Such interposition rests upon the principle of a clear and certain right to the enjoyment of the subject in question; and it must also be a case of strong and imperious necessity; or the right must have been previously established at law.

A court of equity will not interfere for the purpose of settling the respective rights of parties in the use of water, and determining the quantity the plaintiff is en-

Olmsted *v.* Loomis.

titled to use, in propelling certain machinery; to restrain the defendant, by in-
junction, from drawing the water from a dyke, so as to deprive the plaintiff of
the use of a sufficient quantity to carry his machinery; and to protect the plain-
tiff in the undisturbed use of the water; where the defendant does not dispute
or contest the plaintiff's rights, when the quantity of water he is entitled to
shall be ascertained, but the plaintiff's rights have not been established at law.
It seems the plaintiff has an ample remedy at law, in such a case.
To authorize an injunction there should be not only a clear and palpable violation
of the plaintiff's rights, but the rights themselves should be certain, and such
as are capable of being clearly ascertained and measured.

IN EQUITY.    The bill in this cause alledged that in May,
1802, Jonathan Wales and wife, being the owners of a certain
piece of land in the Oriskany patent, embracing a mill-privilege,
on which C. Wales had previously erected a forge for manufactur-
ing iron, and two blacksmith's bellows, which were then in ope-
ration, sold and conveyed to Alfred Smith and others certain
other premises, describing them, "with the privilege of digging
from the head of said race to said land for the purpose of con-
veying water sufficient to carry an oil mill." And Wales agreed
that the grantees *should have the privilege of the water that
was not wanted for the forge and two blacksmith's bellows.*
In 1806 or 1807, Wales converted the forge into a paper mill,
using the water he had before used in the iron manufactory in
the manufacturing of paper. The bill alledged that when Wales
executed the above conveyance he expressly reserved sufficient
water to carry the said forge as then in use, and which consist-
ed of a forge hammer and two fires blown by two bellows
each, which were then in use, and also for two blacksmith's
bellows thereafter to be erected, which at all times thereafter
were to have the preference in the use of the said water. On
the 9th of February, 1822, Jonathan Wales and wife conveyed
to Walter Olmsted and Chauncey Isbell the premises first above
mentioned, "with the privilege of water as the said Jonathan
Wales then owned it." The plaintiffs averred, in their bill, that
the privilege of water as then owned by Wales was to have suf-
ficient water to use the said forge, consisting of the forge ham-
mer, two fires with two bellows to each fire, and of using water
for two blacksmith's bellows, in addition, and which said forge

hammer and bellows would require the constant use and discharge of a column of from 700 to 800 cubic inches of water to carry the same. Shortly after the execution of this conveyance Chauncey Isbell died; and such proceedings were had that the portion of the premises owned by him was conveyed to Jonathan Wales. Wales and wife conveyed the same to William S. Peck by deed dated March 10, 1829. And by divers conveyances the plaintiffs now claim the premises first above mentioned, as owned by Jonathan Wales at the time the deed from him and wife to Alfred Smith and others was executed, in May, 1802. The defendants Loomis & Graves claim to own the title which was conveyed to Smith and others by Wales and wife, in and by the last mentioned deed. The bill alledged that ever since the said forge was converted into a paper mill, in 1806 or 1807, such paper-mill has been run, and has had the preference of water, and at all times enjoyed and used sufficient to carry the same, unmolested and undisturbed in the full use and enjoyment of the same until about the 1st of January, 1847; that it takes less water to propel the paper mill, &c. as the plaintiffs and others have used the same, than was used while the forge was in operation; that the plaintiffs, or some one of them, have carried on the paper mill and used the water to grind the rags, to drive the machine to glaze the paper, and to drive the pump to wash the rags, for the last sixteen years; and at all times during that period had the first privilege of the water to propel such machinery, which has at all times been conceded to them by owners and occupants of the oil mill, which was situated where the paper mill owned by the defendants now stands. That the defendants' paper mill is situated on the site of the old oil mill, on the same dyke or race which conducts the water to the plaintiffs' paper mill, about 25 rods higher up the race or dyke than the plaintiffs' paper mill, and about two rods from the said race, and that some time during the last season the defendants caused their dyke or race leading from said main race to their mill, to be dug down so that they could draw nearly all the water from the dyke or race leading to the plaintiffs' paper mill, and could so draw as to entirely prevent the plain-

tiffs from using the same. That the defendants purchased the premises owned by them, in 1846; that such premises had, for a long time before, been used for an oil mill, which was changed by the defendants into a paper mill, contrary to the true intent and meaning of some or all of the grants through which they have derived title; that since their paper mill got into operation, in 1847, they had frequently, and at all times, when there was no more than sufficient water in the dyke or race to carry the plaintiffs' paper mill, and also when there was not sufficient to carry both paper mills, used or drawn down the water in the dyke or race, so as to obstruct, hinder, and prevent the plaintiffs from having sufficient water to carry their paper mill, and retarding and hindering them from carrying on their business, and depriving them of the use of the water which had been conveyed to them, and which had been excepted in the several conveyances under which the defendants claim title; the plaintiffs insisting that they, at all times, have used less water with their paper mill than was conveyed to them by their deeds, and was excepted in the conveyances under which the defendants derive title. The plaintiffs prayed for an injunction to restrain and prohibit the defendants from drawing the water from the dyke or race, so as to deprive the plaintiffs of the use of water sufficient to carry the forge, consisting of the said forge hammer and two fires, with bellows to each fire, as they were at the time of the reservation in the title under which the defendants claim, and two blacksmith's bellows, to be propelled by water, as conveyed to the plaintiffs by their several grants, and as excepted in the deed from Wales and wife to Smith and others, under which the defendants claimed title, and as the same existed and was used prior to 1806; that the plaintiffs might have the undisturbed use of the water for their paper mill; that they might be decreed to have and enjoy, at all times hereafter, the necessary and what would be sufficient water for a forge, &c. according to the exception in Wales' deed; that they might have the undisturbed use of the water for the paper mill; that the rights of the plaintiffs and the defendants might be decreed and settled between them; and that the defendants might be decreed to

pay costs; and for general relief. The defendants put in an answer, and proofs were taken, and the cause was heard upon pleadings and proofs. The facts appearing in evidence sufficiently appear from the opinion of the court.

*Foster & Bennett*, for the plaintiffs. The defendants derive title through a deed from Jonathan Wales, dated May 4, 1802, which conveys for an oil mill the privilege of water that is not wanted for a forge and two blacksmith's bellows. The plaintiffs derive title from Wales by deed of 9th Feb. 1822, of all his privileges of water "as he owned it." I. Wales, being the general owner at the time of the grant, had a right to use the balance of water not granted, for any purpose he pleased. But, the grantees, Smith, Loomis, and Trowbridge, only took what was specifically granted, and were limited in the use, to the particular object for which it was conveyed. (*Ashley* v. *Pease*, 18 *Pick*. 268.) II. When a right exists, to use a certain quantity of water for propelling machinery, a change may be made in the mode and object of the use, and in the plan of using it, if the quantity used is not increased, and the change is not to the prejudice of others. (*Whittier* v. *Cocheco Manufacturing Co.* 9 *N. Hamp. Rep.* 454. *See U. S. Dig. Sup. vol.* 2, *p.* 925 ; *Id. vol.* 3, *p.* 642, §§ 35, 40 ; *Blanchard* v. *Baker*, 8 *Greenl.* 253 ; *Johnson* v. *Rand*, 6 *N. Hamp. Rep.* 22.) III. The person holding a subordinate right to the water was bound to shut down his gate whenever there was a deficiency. (*Sumner* v. *Foster*, 7 *Pick*. 32.) IV. The preference of water has been conceded to the plaintiffs and the persons from whom they derive title, from 1806 or 7 to within two years since. The defendants have converted the oil mill to a paper mill. V. There has been 42 years acquiescence of all parties concerned, in the change by the plaintiffs from a forge to a paper mill, and the quantity of water used for the paper mill, forty years without objection. VI. The proof shows that the whole stream, in low water, was insufficient to carry the forge and bellows. This is shown by the erection and abandonment of the trip hammer. Besides, a great number of witnesses testify to it; and that,

when the creek was at least one-third larger than at present.
VII. The grant was for an oil mill, specifically, which only ran
two or three months in the year—spring and fall—when high
water ; and the defendants forfeited their right to water when
they made the change to a paper mill.   It is fair to conclude
that the grantor would not have sold for any other purpose.
VIII. The reservation in the defendants' title has been always
continued, and is the same in the deed from Bela Allen to Henry
G. Loomis of the 10th Dec. 1845—always using the words
" except also the privilege of the water of said creek that is not
wanted for a forge and two blacksmith's bellows."   Thus at all
times conceding that amount of water to the plaintiffs. IX. The
amount of water required for the forge and two blacksmith's
bellows is shown to be far greater than the amount of water
used for the plaintiffs' paper mill, and that the plaintiffs use no
more water than they are entitled to.   X. The plaintiffs hav-
ing drawn the required amount of water for their paper mill,
for more than 20 years before the defendants erected their mill,
their rights became settled, to the amount used by them.
XI. The defendants had no right to lower their flume so as to
enable them to draw all the water out of the dyke.   They
wrongfully trespassed upon the plaintiffs' rights, in drawing
down the water, and refusing to shut down their gate, so as to
stop or even impede the plaintiffs' mills, and the plaintiffs are
entitled to the relief prayed for in their bill.

  S. Beardsley, for the defendants.   I. This is not a case of
chancery jurisdiction.   But if it is a case cognizable in the court
of chancery, the plaintiffs show no right to have a decree in
their favor.   (1.) Jonathan Wales is the common source of title
to both parties.   (2.) By his deed to Alfred Smith and others of
the 4th of May, 1802, Wales gave to them, their heirs and as-
signs, an absolute right to sufficient water to carry an oil mill,
and beyond that quantity, a right to all which was not wanted
for the forge and two blacksmith's bellows.   The defendants
have all the right conveyed by that deed.   II. The right re-
served by Wales in his deed to Smith and others, if effective for

Olmsted *v.* Loomis.

any purpose, was only of the water " wanted for *the* forge and two blacksmith's bellows ;" and the plaintiffs do not claim that they have been disturbed in the use, by them, of water for any such purpose. III. The plaintiffs, although their paper mill is near the site of the forge, are not on that site, nor does it appear they use the water at as good advantage as it was used in the forge. IV. The plaintiffs' claim of title is defective. V. If, however, the plaintiffs may, under the exception or reservation in the deed to Smith and others, or under the agreement of the same date with the deed, claim a preference of water sufficient to carry a forge with a hammer and four forge bellows, and also for two blacksmith's bellows, they have not shown that any such right has been violated by the defendants. (1.) The subject matter of the litigation, and on which the alledged rights of the parties are based, has been so much changed since 1802, when the deed was given, that no reasonably certain conclusion as to these rights, can be drawn from what is shown by the plaintiffs, in the bill, or by their testimony. (2.) The plaintiffs have not shown what quantity of water would be required for a forge, &c. or what quantity was used by this forge in 1802; nor that the quantity now used by them does not exceed what a forge, &c. would require; but the evidence on the part of the defendants does establish that the plaintiffs will require two or three times the quantity which would be needed for a forge.

*By the Court,* PRATT, J. The effect of the deed of 1802, from Wales to Smith and others, was to convey to them an absolute right to the surplus water, over and above what was necessary to carry the forge and two blacksmith's bellows. Although the oil mill is mentioned, both in the deed and the collateral agreement, as the object to which the water privilege was to be applied, yet the grant is in terms absolute, being the water which is not wanted for the forge and blacksmith bellows. The conveyance of the site is also absolute in its terms, and the covenant on the part of the grantees to keep one half the race in repair is not limited to any time, but is perpetual—all

clearly indicating that the parties intended that the conveyance of the privilege should be absolute and perpetual.

I am also of the opinion that the reservation was intended to be absolute, and that the forge and two blacksmith's bellows are mentioned in the reservation not for the purpose of prescribing the use to which the water reserved should be applied, but simply as a measure of quantity. It is true that both the oil mill and the forge, in the contemplation of the parties at the time, were the immediate objects to which the water was to be applied; but they did not intend to be restricted in its application to those objects.

As a general rule, grants or reservations in conveyances for water privileges should be deemed absolute, unless it clearly appears from the conveyance that the contrary was intended; for such a construction is most favorable to the interests of the community. The water privileges furnished by the numerous streams in this country are continually increasing in value, and the interests of the public, as well as of the proprietors, are best subserved by the free and unrestricted application of such privileges to such machinery as the wants of the community may require. In the early settlement of the country saw mills, grist mills, and carding and cloth dressing mills for custom work were most in demand to supply the wants of the early settlers; and hence, in most of the early conveyances of water powers, allusion is made to some of that kind of mills. But they are rapidly going out of use, and cotton and woollen factories, paper mills, and other machinery adapted to the present business of the country, are taking their places. If, therefore, conveyances in which the former are mentioned in connection with the water privilege conveyed, are to be construed as limiting the use of the water, the alternative will only be left to the proprietor between continuing the application of the water to such uses or losing it entirely. In that case it would often continue to be applied to uses comparatively unprofitable, rather than to be wholly lost by the owner.

It is true that a given conveyance is to be construed so as to carry into effect the intention of the parties, when that intention

can be ascertained from the instrument itself. But when there is doubt, that construction should be adopted which will render the grant absolute, rather than limited; and such is the general result of the later decisions. (*See Ashley* v. *Pease*, 18 *Pick.* 265; *Bigelow* v. *Battle*, 15 *Mass.* 313; 4 *Coke*, 86; *Cromwell* v. *Seldon and others, decided in this court ;* 6 *N. Hamp.* 22; 21 *Wend.* 290.)

But in this case a more important question is presented for the consideration of this court, viz. : Whether a case is made out by the allegations in the bill and proofs taken in the cause, to authorize this court to grant the relief prayed for in the bill. It is well established that a court of equity has concurrent jurisdiction with courts of law in cases of private nuisance. (*Angell on Water Courses*, 174. *Eden on Inj.* 269. 2 *John. C.* 165. *Story's Eq. Juris.* §§ 925 *to* 930.) But it is equally well established that it is not every violation of the rights of another which may be ranked under the general head of nuisance which will authorize the interposition of the equitable powers of this court. Such interposition rests upon the principle of a clear and certain right to the enjoyment of the subject in question, and it must also be a case of strong and imperious necessity, or the right must have been previously established at law. (*Angell on Water Courses*, 175. *Story's Eq.* 925 *to* 930. *Van Bergen* v. *Van Bergen*, 3 *John. C.* 282. *Reed* v. *Gifford*, 6 *Id.* 19. 4 *B. & C.* 8.)

To authorize an injunction there should be not only a clear and palpable violation of the plaintiff's rights, but the rights themselves should be certain, and such as are capable of being clearly ascertained and measured. What are the rights of the plaintiffs as set forth in the bill ? If we have come to a correct conclusion as to the construction which should be given to the deed of 1802 from Wales to Smith and others, the plaintiffs and defendants have both the right to draw water from a common race or dyke; the plaintiffs sufficient to carry a forge and two blacksmith's bellows, and the defendants the remainder; the plaintiffs having the preference when there is not water enough for both. The plaintiffs alledge that their paper mill takes no

more than that quantity of water. Conceding that to be so, what is the injury complained of? It is that the defendants "got their paper mill into operation about January, 1847, and have frequently and at all times when there was no more water in the dyke than sufficient to carry the plaintiffs' mill, and also when there was not sufficient to carry said mill and the defendants' mill, used and drew down the water in the dyke so as to obstruct, hinder, and prevent the plaintiffs from having sufficient water to carry their paper mill, retarding and hindering the plaintiffs from carrying on their business, and depriving them of the use of the water."

This contains the whole grievance alledged against the defendants. There is no allegation showing what part of the time, if any, there was not sufficient water for both, nor the extent of the injury inflicted upon them. Nor is there any allegation that the defendants claim or insist on any rights inconsistent with those of the plaintiffs, or that there is any reason to apprehend a continuance of the encroachment upon the plaintiffs' rights. For aught that appears in the bill, the alledged violations of the plaintiffs' rights were merely the result of accident, or at most carelessness on the part of the defendants in using water from a common race; doing the plaintiffs no permanent or great injury. There is nothing to show that a suit at law would not afford the plaintiffs ample relief. But perhaps we ought to notice the allegation in the bill that the defendants had deepened their race; for perhaps that was also intended to be alledged as a violation of the plaintiffs' rights. But there is no allegation that a race to the defendants' mill, capable of drawing water from the bottom of the dyke, necessarily conflicts with the plaintiffs' use of the water, or is not necessary to enable the defendants to use the water to which they are entitled, to the best advantage. We are therefore not authorized to say that the defendants by deepening their race have done wrong.

Let us then assume that the allegations in the bill have all been clearly proved, do they show the plaintiffs entitled to the relief prayed for? And that is all the plaintiffs can ask. They can claim nothing for any case they have made out by their

proofs different from that stated in their bill. The maxim *allegata et probata* is applied with strictness to cases in equity. (*James* v. *McKernon*, 6 *John.* 543.) This leads us to an examination of the relief prayed for in the bill.

The prayer is that the rights of the parties may be decreed, and that the defendants may be restrained by injunction from drawing the water from the said dyke so as to deprive the plaintiffs of the use of the water, sufficient to carry the forge, as it was at the time of the conveyance from Wales to Smith and others, and two blacksmith's bellows, and that the said plaintiffs may have the undisturbed use of the water for their paper-mill. Now, as before observed, the bill does not show that the defendants contest or dispute these rights. And hence the only object or benefit of an injunction would be to give the plaintiffs a summary method of punishing the defendants for any accidental or careless, or wilful violation of their rights. We have been unable to find a case in the books where, under such circumstances, this extraordinary remedy has been granted. It would still leave the whole disputed point, to wit, the actual amount of water to which the plaintiffs are entitled, undisposed of. It would leave open for a contest upon affidavits, upon every application for an attachment for breach of the injunction, the fact whether the plaintiffs had actually used as much water as they were entitled to under the deed of 1802. If we should attempt to settle the rights by measurement, the bill furnishes us no aid. It alledges that the old forge used from 700 to 800 cubic inches of water, but at what head the column was to be measured it is not stated. If we turn from the bill to the proofs, the difficulties in the way of granting the relief are not diminished. The evidence does not show that the defendants have denied the rights of the plaintiffs as reserved in the deed of 1802; but the question between the parties seems to be the amount of water necessary to carry a forge and two blacksmith's bellows. When that amount shall be ascertained, there is nothing in the evidence which shows that the defendants are disposed to deprive the plaintiffs of that quantity. What that quantity is, or at least whether the plaintiffs have been deprived of it, a court

of law is quite as competent to determine as a court of equity. In fact the particular amount, for the purposes of the relief prayed for in the bill, it would not be necessary to ascertain. An approximation to correctness, in a court of law, would be sufficient. But should we attempt to ascertain the quantity of water to which the plaintiffs are entitled, the evidence is so conflicting that we should necessarily be left to conjecture. The plaintiffs' witnesses vary about one half in their estimates of the quantity used for the old forge; and the defendants' witnesses are about as conflicting. All who speak of the fact concur in saying that the old forge, owing to its being out of repair, used much more water than was necessary.

We do not construe the reservation as entitling the grantor to all the water which might have been used for the forge as it then was, but to all the water necessary for it when in reasonably good repair. What that quantity would be but few, if any, of the witnesses testified. The fact that the forge was changed into a paper mill, so soon after the conveyance of 1802 containing the reservation, that one of the owners of the oil mill assisted in its erection, and that the paper mill has been allowed to run so many years, undisturbed, affords strong presumptive evidence that the general use of the water for the paper mill, did not vary materially from the quantity previously used for the forge. Indeed, it is much more satisfactory than much of the testimony of the witnesses, in relation to the quantity used. But the wheels of the paper mills seem to have been changed in 1832, and the capacity of the spouts leading from the flume was increased, as I understand the testimony. Besides, it is also proved that in the year 1847, the flume and spouts to plaintiffs' mill leaked considerably, so that much water was wasted. It is therefore impossible, from the testimony, to ascertain the precise quantity to which the plaintiffs were entitled, or to determine whether, at the particular times when there was a deficiency of water, the plaintiffs, by unnecessary leakage and otherwise, were not using more water than they were entitled to. But suppose it were proved that the paper mill could not draw any more water than the plaintiffs are entitled to use,

how can we protect them in the enjoyment of such right? Perhaps a point might be ascertained in the sides of the dyke, above which it would be proper for the defendants to draw, and the prism of the dyke below such point would be sufficient to convey the requisite quantity for the plaintiffs' mill, so that by compelling the defendants to draw above such point, they could not interfere with the plaintiffs' rights. But there is no evidence establishing such point; and if there were, it might turn out that the defendants could not use the surplus belonging to them to as good advantage, restricted in that manner, as they otherwise could.

It seems to us, therefore, that the difficulties in the way of attempting to restrain these parties, as the case now stands, within the limits of their legal rights, by process of injunction, are insuperable. In the language of the lord chancellor in the case of *Risson* v. *Hobart*, (3 *Myl. & Keene*, 169,) we may say, "What purpose could such an injunction serve? It would give no information; it would prescribe no (certain) rule or limits to the defendants. It could not, in any manner of way, be a guide to them if it did not operate as a snare. It would, in reality, amount to nothing more than a warning that if they did any thing which they ought not to do, they would be punished by the court; but it would leave to themselves to discover what was forbidden and what allowed. If after receiving such warning they acted upon the opinion of impartial men, and yet some damage followed, this court could not visit them very severely. The parties injured might then, indeed, recover damages at law, having leave to sue, but so they might of course recover damages if no injunction had issued, and without asking leave to sue."

If the defendants had no right to draw water from the dyke it would come within the cases in the books, and would be free from difficulty. But this case falls far short of those cases where the rights of the parties were clearly ascertained, and where the courts of equity have interposed by injunction for the purpose of preventing great and irreparable mischief. No such irreparable mischief is apprehended in this case; no threatened

danger calls for such a remedy.   A simple action at law to recover the damages, for any thing that yet has been made to appear, will be amply sufficient, not only to compensate the plaintiffs for the injury sustained, but to prevent a repetition of the wrongs on the part of the defendants.

We are, therefore, of the opinion, as well upon the matters of the bill as upon the proofs, that the bill should be dismissed. But as the difficulties in the plaintiffs' case appeared upon the face of the bill itself, and the defendants, instead of demurring, have put in their answer and have gone through a long, tedious, and unnecessary litigation, the bill should be dismissed without costs, and without prejudice.

Decree accordingly.

