## Case No. 10,752.

PARKER v. WINNIPISEOGEE LAKE COT-
TON & WOOLEN MANUF'G CO.

[1 Cliff. 247.] [1]

Circuit Court, D. New Hampshire.    May Term,
1859.[2]

EQUITY JURISDICTION—DAMAGES—REMEDY AT
LAW.

Equity jurisdiction will not be entertained in
a case where the complainant alleges damages
to his rights in consequence of the wrongful acts
of the respondents, and where the whole case
made in the bill is denied in the answer, unless
the right of the complainant is clear and well
defined, and there is danger of irreparable in-
jury from the continuance of the nuisance, or
unless where the right is clear and the injury
certain, an injunction is necessary to prevent
multiplicity of suits or suppress interminable or
oppressive litigation.

[Cited in Tuttle v. Church, 53 Fed. 427.]
[Cited in Varney v. Pope, 60 Me. 195.]

This was a bill in equity praying for an
injunction to restrain the corporation de-
fendants [the Winnipiseogee Lake Cotton
& Woolen Manufacturing Company] from
raising the surface of Lake Winnipiseogee,
in the state of New Hampshire, or from re-
tarding, obstructing, or holding back the nat-
ural flow of the water out of the lake and
along the channel of the river constituting
its outlet, to the premises of the complainant
[John A. Parker]. The complainant alleged
in effect as follows: that he was the owner
of a certain parcel of land situated in La-
conia, in this state, formerly owned by Dan-
iel Tucker, together with the water privilege
connected with the same, conferring the
right to draw and use the one half of the
water from the flume connected with the
premises, together with a certain described
portion of the second story of the building
erected on the walls of the trip-hammer
shop, with the water right and mill privilege
of one twelfth part of the whole water pow-
er of the outlet or river on the Laconia side,
at the dam there erected, in the village of
Meredith Bridge. He further alleged that
the outlet of the lake is called Winnipiseogee
river, and has its source in the lake at a
place called the "Weirs," six miles above
the village of Meredith Bridge, where the
complainant's premises are situated. The
outlet was formerly by a natural channel,
about fifty yards wide, and from five to
seven hundred feet in length, when the
water passed into Long Bay, and at the foot
of the channel there was a natural fall of
about three feet. Long Bay is a sheet of
water about four and a half miles in length,
and from a half-mile to a mile in width.
At its foot the water is discharged into what
is called Little Bay, through a channel about
one thousand feet in length. Lake Village
is situated on this channel. Here, before the
dam was built, there was a natural fall of

1 [Reported by William Henry Clifford, Esq.,
and here reprinted by permission.]
2 [Affirmed in 2 Black (67 U. S.) 545.]

several feet. From that point the channel
of the river passes across the southerly end
of Little Bay, a distance of about a mile
and a half, and then the stream empties
into Sanbornton Bay, through a channel from
fifteen hundred to two thousand feet in
length. Little Bay forms the head-waters
of the dam, connected with the premises of
the complainant, which were situated in the
village of Meredith Bridge, on the margin of
the channel between the two last-mentioned
bays. For the distance of about five miles,
the current of the river then passes through
Sanbornton Bay, and is then discharged out
of it at a place called Union Bridge, and
from Union Bridge the river pursues its
course in nearly a right line to the Merri-
mac. In the year 1831, as the complainant
alleged, the respondents became possessed
of a certain water right and mill privilege
situated on that river, above his premises,
at the place now called Lake Village, where,
in the year 1835, they constructed a dam
across the river, or became the proprietors
of it after it was constructed; this dam be-
ing higher than any former one. Moreover,
that the dam was so constructed, that it en-
abled them to raise the water in Long Bay
several feet, and draw it down again to its
natural level, but as it did not disturb the
level of the water in the lake, he did not
complain. Subsequent to the year 1846, as
the bill alleged, the respondents, claiming to
hold possession of the land commanding the
outlet of the lake, at the weirs, above the
complainant's premises, made excavations
through the fall in the river, by which the
river bed was deepened six or seven feet,
the fall mostly removed, and the water from
the lake brought into the bay in larger quan-
tities than it naturally flowed, by which the
natural level of the lake might be lowered
four or five feet. In 1851 or 1852 the re-
spondents erected another dam at Lake Vil-
lage, below the one previously existing, and
of equal or greater height, whereby they
could raise the water in the bay to the level
of the lake, could discharge a much greater
quantity of water than formerly and nat-
urally flowed in the river channel, and could
control the amount of water both in the lake
and in the river. By this, the complainant
alleged, that his water power was damaged,
by the unequal supply of water produced in
consequence of the respondents' dams and
excavations. Another ground of complaint
was, that one Stephen Perley wrongfully cut
a canal through his own land, tapping the
bay above complainant's dam, by which
water was drawn out of the bay above com-
plainant's dam, and returned into it below
the same; that respondents had bought
the canal, deepened it, and removed a dam
at its mouth, which dam was erected to pre-
vent the water passing into the canal until
at a certain height at his dam. The bill
prayed that respondents might be restrained
from raising the surface of the lake, from

holding back the natural flow of the water out of the lake, or along the river to complainant's premises; and therefore prayed that they might be compelled to reduce the size of their gates, prohibited from adding to the height of their dam, and be compelled to make a solid stone dam across their excavations at the outlet to the height of the bed of the channel, so as to render it impossible to draw off the water of the lake below its former natural level; that they may be restrained from the use of the canal, or, if permitted to use it, they shall raise the channel of the inlet to the height it was at the time of their purchase. Such were the material allegations of the bill, which were, for the most part, denied in the answer, except the building of the dams, and making the excavations through the fall of the river. Possession by complainant of a twelfth part of the water power of the river, on the Laconia side, at the dam there erected in the village of Meredith Bridge, or that he owned any water right or mill privilege whatever in the premises, except the one half of a certain fixed and limited water power, were denied in the answer. It was alleged that complainant owned no part of the land where the dam stood, but it was admitted that he owned a right to draw water to carry wheels for operating a trip-hammer, grindstone, and bellows, and that it was to be drawn through a long open flume of a certain height and dimensions. It was further set up in the answer, that the quantity of water which the complainant was entitled to draw did not vary with the height of the water in the dam, unless the water fell to a level lower than the top of the flume, and the respondents alleged that it never had so fallen through their act or agency. The respondents also alleged that one Francis Boynton owned the right to draw water from the flume connected with the premises, sufficient to carry wheels to operate a trip-hammer, grindstone, and bellows, and that he sold one half that right to the complainant.

John A. Parker, pro se.
William H. Y. Hackett, for respondents.

CLIFFORD, Circuit Justice. Inequality in the quantity of water flowing in the river by the premises of the complainant greater than what naturally arose from the ordinary changes of the season, or from the ordinary fluctuations in the head of water in the lake before the attempted regulation of the same by the respondents, constitutes the gravamen of the injury alleged to have been sustained by complainant. His representation is that the water power of his privilege is damaged to the same extent as the equality of the supply of water at all seasons is disturbed for the use and improvement of his water power. He does not allege that the quantity of water is too small or too great in his flume, nor does he pray for an increased or diminished quantity to flow into the same, or to be protected against back water, but prays that the respondents may be restrained from using and perfecting their improvements for regulating the flow and supply of water in the dam, solely upon the ground that his rights are damaged by such regulation. Accordingly he alleges that the respondents have seized upon and taken possession of the waters of the lake, and used the same as a reservoir to his hurt and damage, in the use, value, and capacity for improvement of the water power at Meredith Bridge, and have extended and intend to extend their excavations so as to enable them to draw off the water from the lake six feet below its former low-water level. What he seeks to accomplish is, to restore the flow of water from the lake and in the river to its former state, and to preserve it in that condition. Looking at the answer of the respondents, it is obvious that they deny the whole case made in the bill of complainant. They deny that the complainant is seized and possessed of one twelfth part of the water power of the river on the Laconia side, and in fact deny that he owns any part of the dam, or any right in the water power, except a restricted easement authorizing him to draw and use a certain limited quantity of water equal to one half of the quantity sufficient to carry the wheels to operate a trip-hammer, grindstone, and bellows, or equal to one half the water in the flume described in the answer, and in respect to that easement they expressly deny that they have ever interfered with the same, or in any manner injured his mill privilege or water power. Beyond question, therefore, the case is one where the whole ground of relief set up in the bill of complaint is expressly controverted and denied by the answer. Under these circumstances, it is insisted by the counsel for the respondents that the case is not one where this court sitting as a court of equity can properly take jurisdiction, but that the jurisdiction must be declined for the want of equity in the bill. In regard to private nuisances, Judge Story says: "The interference of courts of equity is undoubtedly founded upon the ground of restraining irreparable mischief, or of suppressing oppressive and interminable litigation, or of preventing multiplicity of suits, and he well remarks that it is not every case that will furnish a right of action against a party for a nuisance which will justify the interposition of courts of equity to redress the injury or remove the annoyance. But there must be such an injury as from its nature is not susceptible of being adequately compensated by damages at law, or such as, from its continuance or permanent mischief, must occasion a constantly occurring grievance which cannot be otherwise prevented but by an injunction." 2 Story, Eq. Jur. (7th Ed.) p. 230, § 925; Georgetown v. Alexandria Canal Co., 12 Pet. [37 U. S.] 98.

Irreparable injury, actual or threatened, is not alleged in this case, and there is nothing in the nature of the grievance or the proofs exhibited to warrant the conclusion that any such consequences are likely to flow from its continuance. "Courts of equity will interfere by injunction," says Shepley, J., in Porter v. Witham, 17 Me. 294, "where the party has long, and without interruption, enjoyed a right which has been recently injured, or which is in danger of being injured or destroyed;" and when, if it has not been established by long usage, it has been by a judicial decision, but it is not ordinarily to determine the right in the first instance that chancery hears the case, and then, if found to be established, exercises its extraordinary power to protect it. Chancery interference, in the first instance, rests on the principle of a clear and certain right to the enjoyment of the matter or thing in question, and an injurious interruption of that right, which on just and equitable grounds ought to be prevented. Morse v. Machias Water-Power & Mill Co., 42 Me. 119. Accordingly it has been well held that it must be "a strong and mischievous case of pressing necessity," or the right must have been previously established at law, to entitle the party to call to his aid the jurisdiction of a court of equity. Van Bergen v. Van Bergen, 3 Johns. Ch. 282; 2 Eden, Inj. per Waterman, 269; Gardner v. Village of Newburgh, 2 Johns. Ch. 165; Reid v. Gifford, 6 Johns. Ch. 19; 2 Story, Eq. Jur. (7th Ed.) § 924a. If the thing sought to be prohibited, said Lord Brougham in Earl of Ripon v. Hobart, 3 Mylne & K. 169, is in itself a nuisance, the court will interfere to stay irreparable mischief without waiting for the result of a trial at law; but where the thing sought to be restrained is not unavoidably and in itself noxious, but only something which may, according to circumstances, prove so, then the court will refuse to interfere until the matter has been settled at law. Where the title or injury is doubtful or disputed, or where the injury is slight and inconsiderable, courts of equity are disinclined to interfere. Whittlesey v. Hartford, P. & F. R. Co., 23 Conn. 421; Adams, Eq. 487, note. Mr. Angell concurs with Judge Story, that the interference of courts of equity by injunction in matters of private nuisance is founded upon the ground of restraining irreparable mischief, or of suppressing oppressive and interminable litigation, or of preventing a multiplicity of suits; and he affirms that they will interfere in those cases only, as a general rule where the right of the party complaining is clearly established, and the injury which he must necessarily sustain is of such a nature that no adequate compensation can be afforded by damages, unless when delay itself would be wrong. Ang. Water Courses, § 444; 3 Daniell, Ch. Prac. 1858; Wynstanley v. Lee, 2 Swanst. 334; Whitchurch v. Hide, 2 Atk. 391; Coalter v. Hunter, 4 Rand. [Va.] 58; Gates v. Blincoe, 2 Dana, 158. No remedy whatever exists in equity for a public nuisance, says Mr. Justice Woodbury, in Irwin v. Dixion, 9 How. [50 U. S.] 27, unless the individual has suffered some private, direct, and material injury beyond the public at large, as well as damages otherwise irreparable. In cases of injury to individual rights by obstructions or supposed nuisances, the same learned judge says that an injunction is still less favored, and finally adds that when the right or title to the place in controversy, or to do the act complained of, is doubtful and explicitly denied in the answer, no permanent or perpetual injunction will usually be granted till a trial at law is had, settling the contesting rights and interests of the parties. Where the thing sought to be prohibited is in itself a nuisance, or where from its position as exhibited in the proofs it is necessarily such, and there is no doubt or controversy about the right of the complaining party, or the nature and extent of the injury, a different rule prevails. Pennsylvania v. Wheeling Bridge Co., 13 How. [54 U. S.] 567. But where the evidence to establish the right is conflicting, and it is doubtful whether any appreciable injury has been suffered, chancery will not interfere until the rights of the parties are settled at law. Brown's Case, 14 Ves. 415; Weller v. Smeaton, 1 Cox, Ch. 102; Attorney General v. Utica Ins. Co., 2 Johns. Ch. 371; Dana v. Valentine, 5 Metc. [Mass.] 14; Ingraham v. Dunnell, 5 Metc [Mass.] 126. To authorize an injunction there should be not only a clear and palpable violation of the rights of the complainant, but the rights themselves should be certain, and such as are capable of being clearly ascertained and measured. Olmsted v. Loomis, 6 Barb. 160. All of these cases, or nearly all of them, proceed upon the ground that equity jurisdiction is not to be entertained in cases like the present, unless the right of the complainant is clear and well defined, nor unless there is danger of irreparable injury from the continuance of the nuisance, or unless where the right is clear, and the injury certain, an injunction is necessary to prevent a multiplicity of suits, or to suppress oppressive or interminable litigation. One suit at law will probably determine the nature of the complainant's rights and the extent of his injuries, and if, when that determination is made, the respondents fail to respect those rights, it will then be competent for the complainant to seek the interposition of a court of equity. Having come to this conclusion, no opinion will be expressed upon the merits of the controversy, except to say that the facts of the case as well as the pleadings clearly bring it within the rule requiring the court to decline jurisdiction until the rights of the parties are settled at law. Bill dismissed.

[On appeal to the supreme court, the decree of this court was affirmed. 2 Black (67 U. S.) 545.]