TUTTLE et ux. v. CHURCH et al.

(Circuit Court, D. Rhode Island.   December 21, 1892.)

NUISANCE—INJUNCTION—FISH-OIL FACTORY.  ·
    The operation of a factory for making oil and fertilizers from fish should not be enjoined on the petition of the owner of a summer cottage, distant a mile and a half therefrom, when the family of counsel instigated, directed, and furnished money to carry on the suit; when there is no regular or serious pollution of the water, and the offensive odors have decreased by reason of improved processes so as to be seldom troublesome in the summer; when the cottager has lived in that vicinity 13 years and in his present house 10 years, while the factory had been in operation 20 years; and when the granting of an injunction would inflict great injury upon the factory owners and many employes, while its denial would injure the cottager but little.

In Equity.   Bill by Elias A. Tuttle and wife against Daniel T. Church and others, doing business under the firm name of Joseph Church & Co., to enjoin them from maintaining a nuisance.   Bill dismissed.

Patrick J. Galen, Benjamin Barker, Jr., and Arnold Green, for complainants.
Miner & Roelker, for defendants.

COLT, Circuit Judge.   This bill in equity is brought to enjoin the defendants from maintaining an alleged nuisance.   The defendants, under the firm name of Joseph Church & Co., are engaged in the business of expressing oil from fish, and the manufacture of fertilizers

from fish, in the town of Portsmouth, R. I. The plaintiff Cornelia S. Tuttle, wife of the coplaintiff, Elias A. Tuttle, is the owner of a dwelling house situated a mile and a half in a southerly direction from the defendants' works, in the adjacent town of Tiverton, where she and her husband are accustomed to spend the summer months. It is contended that the defendants' factory emits strong and offensive odors and smoke, which blow over and through the plaintiffs' dwelling house, thereby corrupting the air; that the matter from the factory pollutes the waters of Seaconnet river in the vicinity, and of Narragansett bay in proximity thereto, thereby destroying and injuring the edible quality of the shellfish; that such pollution prevents the full, free, and comfortable use of these waters for bathing, fishing, sailing, and other purposes; that the corruption of the air and water is deleterious to the health, and destructive of the comfortable and healthful use of the plaintiffs' premises, and that it diminishes their value, and the power to rent the same. These allegations the defendants deny.

It appears that works for expressing oil from fish have been in continuous operation on their present site for about 30 years, and that the defendants purchased them 12 years ago. They value the plant, including the boats, at more than $300,000, and they have spent about $90,000 in improvements since the plaintiffs have occupied their present residence. They give employment to about 450 persons. The plaintiffs' property cost them, with improvements, $2,750, and they have offered to sell the place for $3,500. They have lived in Tiverton during the summer months for the past 13 years. They have occupied their present house since 1882, and for five years prior to that time they lived in a house one half a mile nearer the works of the defendants. During all these years they made no complaint until the present suit was brought. The plaintiff Elias A. Tuttle admits that this suit was begun at the request of Benjamin Barker, Jr., one of the counsel of record in the case, in order that it might be brought in the United States court. It seems that Barker's father had previously had a quarrel with the firm of William J. Brightman & Co., who carry on the same kind of business as Church & Co., and who are defendants in another suit similar to this. Both suits were entered the same day, the same testimony was used by agreement in both cases, and they were heard together.

The quarrel between the elder Barker and Brightman & Co. was over a road or private passway near the latter's works, and, in the suit which followed, Barker was beaten. He subsequently made threats that he would follow Brightman & Co. and prove their works a nuisance, and that to do this it was necessary to bring suit also against Church & Co. Mr. Barker, Sr., has been present at the various hearings before the examiner, instructing counsel as to the witnesses, and generally directing these cases. He has also furnished money to carry them on. In March, 1891, his son wrote to George Alexander, of Baltimore, Md., who owns real estate in Tiverton, urging him to bring suit against the fish works there as a nuisance. Subsequently an action at law was entered in this court by Alexander against the defendants. The fish used in this manufacture are the

menhaden. The process of manufacture as at present conducted is as follows: The fish are hoisted from the holds of the vessels to the pens, which are elevated boxes above the wharf. From these pens they are carried by a runway to the tanks, where they are cooked in fresh water from 30 to 50 minutes. After the fish have been boiled, the water is drained from the vats. They are then placed in adjoin- ing compressers, and subjected to great hydraulic pressure, and the oil expressed therefrom runs into barrels. The fish scrap remaining in the compressers is then dried by exposure to the sun, or treated with sulphuric acid, which prevents decomposition. This scrap is then deposited in storehouses, to be sold for fertilizing purposes. The water from the vats in which the fish are boiled is drawn off and run through a series of settling basins or tubs. It is subjected to heat, when the oil rises to the top, and is skimmed off, and the nitrogenous matter sinks to the bottom. This operation is repeated until all the oil and other matter are taken from the water, which then runs into the Seaconnet river. About the time of the commencement of this suit the defendants made a contract to sell this waste water to the Phospho-Ammonia Company, who have a factory near the works, and the delivery of the water to the company began as early as the commencement of the year 1891. During the winter of 1888 and 1889, when there was on hand large quantities of wet acid fish, the defendants ran an artificial dryer, which consists of cylinders into which the fish are thrown, and around which a fire is built. The dryer was also run part of the time during the winter of 1889 and 1890, but since the spring of 1890 its use has been discontinued, un- less the wind blows the smoke off shore and away from the plaintiffs' dwelling, excepting on one occasion, when the wind suddenly shifted, and then the work was stopped. Owing to improved facilities in the handling and cooking of the fish, and the treatment of the scrap or pumice with acid, the better disposition of the waste water, the discontinuance of the use of the dryer except as already described, and the general cleanliness about the works as compared with what formerly existed, the offensive smells have decreased the past few years. Formerly the fish, if the catch was good, would remain for some days piled up in a heap at the works, while now, owing to the increased facilities for boiling, a more speedy disposition can be made of them. Daniel Church, the owner of the works, testifies that the capacity for handling fish has increased the past three years 50 per cent., while there is not much difference, if any, in the amount of the catch. The works have a capacity to handle 12,000 barrels a day, and there are not many days in the year when the catch exceeds 5,000 barrels. He admits, however, that in the cooking of fish a couple of days old, caught in the months of July and August, a smell is inev- itable, and also that the dryer makes an offensive odor. He says the works must shut down if the defendants are enjoined from sending out such odors as are now emitted. Until recent years it was the cus- tom of the neighboring farmers to purchase the scrap for fertilizing purposes. This was spread upon the land, and caused an offensive smell, but this has been discontinued, owing to the high price of scrap.

The plaintiffs seek to prove the defendants' works a nuisance on

three grounds: First, because they have suffered discomfort in their dwelling by reason of the smells and smoke from the defendants' works; second, because they have been deprived of the pleasure of boating, bathing, and fishing in Seaconnet river and Narragansett bay from the pollution of these waters; third, because in consequence of these things the value of their property has diminished.

The plaintiffs have introduced 18 witnesses and the defendants 80. It is claimed that some of these witnesses on both sides may be said to be interested, and, therefore, not free from bias. The record shows that the Barkers are the real instigators of this suit, and one half of the plaintiffs' witnesses are connections or friends of the Barker family, or have been employed by them professionally or otherwise, or were present to testify at their request. So with respect to defendants' witnesses it may be said that perhaps 20 have been at some time employed by the defendants. or are engaged in occupations that make them more or less interested. While the number of witnesses, taken by itself, does not necessarily prove a given fact, if opposed by a smaller number, because credibility, interest, knowledge, and intelligence are to be considered, still it cannot be denied that in this case the defendants have brought forward a mass of testimony which, taken altogether, has not been met by the plaintiffs, either with respect to weight or number. As to the point that the plaintiffs' property has declined in value by reason of the operation of these fish works, this is not proved by the evidence, but, on the contrary, it is shown that the tendency of values in real estate in Tiverton has been upwards, and that from 100 to 150 houses have been built during the past nine years.

With respect to the pollution of the waters in the vicinity, the preponderance of testimony is decidedly with the defendants. It is true that during the summer of 1888, by reason of an accident caused by overloading the fish pen, it broke away, and a large quantity of fish and oil escaped into the waters of Seaconnet river and Narragansett bay, and, in consequence, for several weeks the surface of the water was covered with oil and scum, and deposits were left on the shores. This occurrence is not denied, but that there is any general contamination of these waters caused by defendants' works, rendering them unfit for yachting, fishing, and bathing, and other purposes, is not sustained by the evidence.

If the plaintiffs are entitled to an injunction it must be on the ground that the offensive smoke and odors coming from the defendants' works are a nuisance. It becomes important in this connection to define what constitutes a nuisance. As a general proposition, the carrying on of any business obnoxious to neighboring dwellings by reason of smoke, cinders, offensive odors, or noxious gases is a nuisance. A person is entitled to the enjoyment of pure air and water on his premises, and that which pollutes either in passing over or through his premises, to the extent which renders life uncomfortable, may be considered a nuisance. The question is whether the annoyance is such as materially to interfere with the comfort of human existence. It is not sufficient that the injury is accidental and occasional, but it must be permanent and repeated. The inconvenience

must not be fanciful, or one of mere delicacy or fastidiousness, but an inconvenience interfering with the ordinary physical comfort of human existence, and not merely according to elegant or dainty habits of living, but according to the plain, sober, and simple notions among the English people. Vice Chancellor Bruce, in Walter v. Selfe, 4 De Gex & S. 315, 322; Crump v. Lambert, L. R. 3 Eq. 409; Soltau v. De Held, 2 Sim. (N. S.) 133; Baltimore & P. R. Co. v. Fifth Baptist Church, 108 U. S. 317, 329, 2 Sup. Ct. Rep. 719; Cooke v. Forbes, L. R. 5 Eq. 166; Ross v. Butler, 19 N. J. Eq. 294; Attorney General v. Steward, 20 N. J. Eq. 415; Duncan v. Hayes, 22 N. J. Eq. 25; Gas Co. v. Freeland, 12 Ohio St. 392, 399.

Smoke and noxious odors do not always constitute a nuisance. In determining this question, everything must be looked at from a reasonable point of view. An injury which affects a person's comfort and happiness may or may not be a nuisance, according to the locality in which it occurs. If one voluntarily moves into a town or neighborhood where smoke or noxious gases abound, it may be presumed that he does so for sufficient reasons, and he should not be permitted to come into a court of equity and restrain the prosecution of industries already established, and upon which the business interests and welfare of the community may depend. "If a man lives in a town, it is necessary that he should subject himself to the consequences of those operations of trade which may be carried on in his immediate locality which are actually necessary for trade and commerce, and also for the enjoyment of property, and for the benefit of the inhabitants of the town and of the public at large. If a man lives in a street where there are numerous shops, and a shop is opened next door to him, which is carried on in a fair and reasonable way, he has no ground of complaint, because to himself individually there may arise much discomfort from the trade carried on in that shop." Lord Chancellor Westbury in Smelting Co. v. Tipping, 11 H. L. Cas. 642, 650. "You must look at it, not with a view to the question whether, abstractedly, that quantity of smoke was a nuisance, but whether it was a nuisance to a person living in the town of Shields," says Lord Cranworth in the same case. "The properties of the plaintiff and defendant lie adjoining each other, on the hillside overlooking the city, whose everyday cloud of smoke from thousands of chimneys and stacks hangs like a pall over it, obscuring it from sight. This single word describes the characteristics of this city, its kind of fuel, its business, the habits of its' people, and the industries which give it prosperity and wealth. The people who live in such a city, or within its sphere of influence, do so of choice, and they voluntarily subject themselves to its peculiarities and its discomforts, for the greater benefit they think they derive from their residence or their business there. A chancellor cannot disregard all this." Judge Agnew in Huckenstine's Appeal, 70 Pa. St. 102, 107; Rhodes v. Dunbar, 57 Pa. St. 274, 287.

Looking at the evidence in this case in the light of the foregoing principles, I do not think that the plaintiffs have shown, at least by that preponderance of evidence that is necessary, that the defendants' works are a nuisance as at present operated. It is true the defendants admit that, during hot weather, the cooking of fish which have

been kept two or three days causes a disagreeable smell, and that this will sometimes occur during the months of July and August. It is also admitted that the use of the dryer causes an offensive smoke. But the weight of evidence is to the effect that little or no noxious odors or smoke have been noticed in the surrounding neighborhood the past two years, whatever may have been the case prior to that time. While there may be occasional offensive smells sometimes during the summer months, when the wind is in a certain direction, yet the testimony as a whole goes to show that these smells are now rare, owing to improved methods of manufacture, and the exercise of greater care and cleanliness, and the discontinuance of the use of the dryer except when the wind is off shore. Mr. Barker, Sr., whom it may be assumed is not a wholly disinterested witness, made a memorandum of the times he experienced disagreeable odors in the course of the year since this suit was brought, and they number 16. This may be true, but upon the record as it stands, which can alone guide the court, it is inconsistent with the weight of evidence.

Applying the rules of law which govern causes of this character to the facts and circumstances of this case, I am at least in doubt on the question of nuisance. The bill prays for an injunction against the defendants before the plaintiffs have established their right at law. It is true that a court of equity has the power to grant an injunction before a trial at law, to prevent irreparable injury, multiplicity of suits, or vexatious litigation, where the court has no doubt as to the right of the plaintiffs, but where the right is doubtful, and has not been established at law, this form of relief will be withheld. In other words, the question of nuisance or no nuisance must, where the evidence is conflicting and a doubt exists, be first tried by a jury. If the proceeding was by indictment, and the jury doubted whether it was a nuisance or not, they would be bound to acquit, and the same rule applies to a court of chancery. 2 Story. Eq. (10th Ed.) 105, 106; Railroad Co. v. Ward, 2 Black, 485, 495; Parker v. Winnipiseogee Lake, etc., Co., Id. 545, 552; Irwin v. Dixion, 9 How. 10, 28; Rhodes v. Dunbar, 57 Pa. St. 274; Earl of Ripon v. Hobart, 3 Mylne & K. 169, 181, 1 Cooper, Sel. Cas. 333; Amelung v. Seekamp, 9 Gill & J. 468; Attorney General v. Hunter, 1 Dev. Eq. 12; Parker v. Winnipiseogee Lake, etc., Co., 1 Cliff. 247; Swaine v. Railroad Co., 33 Law J. Ch. 399; Hart v. Mayor, etc., 3 Paige, 213.

Again, no relief will be granted in equity where a party has been guilty of great laches, but he will be left to pursue his remedy at law. Where relief is sought against a nuisance, due diligence must be used in the assertion of rights which are claimed, and equity will not interfere when a party has allowed the defendant to continue in the erection of his obnoxious structure at great expense, and without complaint. The plaintiffs have resided in Tiverton at least portions of each year for more than thirteen years prior to bringing this suit, and for five years previous to 1882 they lived nearer the defendants' works. They passed the works frequently, and were upon friendly relations with the defendants, and they must have observed and known of the improvements which were going on, yet they made no complaint or objection. Under these circumstances it would be inequita-

ble to permit a party to come into a court of chancery and invoke this extraordinary remedy, and thereby restrain the defendants from the prosecution of their business. A delay of three years or more has been ordinarily held to be such laches as will preclude a party from this form of relief, and where an injunction has been granted, and a party fails to prosecute with diligence his action at law, the injunction will be vacated. High, Inj. (3d Ed.) 599; Weller v. Smeaton, 1 Cox, 102; Bickford v. Skewes, 4 Mylne & C. 498; Reid v. Gifford, 6 Johns. Ch. 19; Dana v. Valentine, 5 Metc. (Mass.) 8; Tichenor v. Wilson, 8 N. J. Eq. 197; Southard v. Morris Canal, 1 N. J. Eq. 518; Johnson v. Wyatt, 2 De Gex, J. & S. 17.

The plaintiffs or their predecessors have carried on the business of expressing oil from fish in their present location for upwards of 20 years. The evidence goes to show that owing to improvements in the process of manufacture the odors must be less than they were in past years. It can hardly be said, therefore, that the works are a nuisance to-day, but were not a nuisance 20 years ago. The right to maintain a nuisance can be established by prescription or 20 years' user. It is not necessary to decide that the defendants have established this prescriptive right in the present case, but it is a sufficient reason if the question is in doubt to refuse an injunction until the plaintiffs' right has been tried at law. Ingraham v. Dunnell, 5 Metc. (Mass.) 118; Dana v. Valentine, Id. 8; Smelting Co. v. Tipping, 11 H. L. Cas. 642; Flight v. Thomas, 10 Adol. & E. 590; Bolivar Manuf'g Co. v. Neponset Manuf'g Co., 16 Pick. 241; Bliss v. Hall, 5 Scott, 500; Goldsmid v. Improvement Com'rs, L. R. 1 Ch. App. 349; Campbell v. Seaman, 63 N. Y. 568.

A motion for an injunction is addressed to the sound discretion of the court, guided by certain established rules. This means that the court is to consider all the circumstances of each case before it will exercise this extraordinary remedy. Among the considerations which should influence a chancellor is the relative effect upon the parties of the granting or refusing the injunction. Unless the public good calls for the injunction to issue, it should not be granted where a large number of people are in favor of the acts to be restrained, and no serious damage to individuals is made to appear. Where the right at law is doubtful, the case resolves itself into a question of comparative injury,—whether the defendants will be more injured by the injunction being granted, or the plaintiffs by its being withheld. In the present case the effect of an injunction, according to the evidence, will be to close the defendants' works, destroy their business, and thereby cause the loss of a large amount of invested capital, while the injury to the plaintiffs, if the injunction is refused, is comparatively slight. Attorney General v. Gas Co., 3 De Gex, M. & G. 304, 311; Attorney General v. Conservators of the Thames, 1 Hem. & M. 1; Hilton v. Earl of Granville, Craig & P. 283; Richards' Appeal, 57 Pa. St. 105, 113; Wood v. Sutcliffe, 2 Sim. (N. S.) 163; Torrey v. Railroad Co., 18 N. J. Eq. 293; Railroad Co. v. Prudden, 20 N. J. Eq. 530.

The plaintiffs admit that this suit was brought at the request of Benjamin Barker, Jr., one of the counsel in the case, whose father is the principal witness in their behalf, furnishing money to carry on the

litigation, and directing the taking of the evidence. A court of equity does not look with favor upon a suit brought merely for the purposes and at the instigation of another. Pentney v. Commissioners, 13 Wkly. Rep. 983; Forrest v. Railway Co., 4 De Gex, F. & J. 125.

Considering the circumstances under which this suit was brought, the doubt in the mind of the court on the question of nuisance, the want of diligence on the part of the plaintiffs in instituting suit, the long period of time which the defendants have carried on their business undisturbed and without complaint, and the serious injury which the relief here prayed for would cause them and the large number of people whom they employ, I am clear that no injunction should issue in this case. Injunction denied, and bill dismissed, with costs.