**DE BLOIS et al. v. BOWERS et al.**

No. 3221.

District Court, D. Massachusetts.

Oct. 30, 1930.

Joseph E. Casey and John M. Russell, both of Boston, Mass., for plaintiffs.

Warner, Stackpole, Bradlee & Cabot, of Boston, Mass., for defendants.

MORTON, District Judge.

This is a bill by property owners in the vicinity of the Wickwire-Spencer Company's steel works in Clinton, Mass., to enjoin the defendants from maintaining a nuisance by the emission of obnoxious fumes and odors from a galvanizing plant forming part of said works. The defendants are receivers of the Wickwire-Spencer Steel Company, as alleged in the bill, and are operating the plant. I took a view of the premises while it was in operation and smelt the fumes complained of. At the hearing which followed the view, a considerable amount of oral testimony was introduced. I find the essential facts to be as follows:

The plaintiffs are the owners in fee of various residential properties situated on the north side of Sterling street, Clinton, opposite the steel works and the galvanizing plant in question. All these houses were built before the galvanizing plant was established on its present location in 1915. The De Blois house is a three-decker apartment house; of the others some are single houses, and some have more than one tenement. They are all of wood construction, and none of them appeared to be in what I should call good condition for such properties. The assessed value of the De Blois property, which is the

nearest to the galvanizing plant, is $3,575: of the Stewart property, which is the next property east belonging to the one of the plaintiffs, $3,000; of the Shanbaum property, $3,950; and of the Calcia property, $3,000. The aggregate assessment on all the plaintiffs' property is $22,925. There is no evidence that the presence of the galvanizing plant has diminished their value, nor that they would be more valuable if the steel works were permanently closed down.

The plant of the Wickwire-Spencer Company is assessed for $1,100,000. It employs several hundred persons and has a monthly pay roll running from $60,000 to $90,000. About 60 per cent. of its total output is galvanized. If a galvanizing plant cannot be operated in connection with the works, the testimony is that they will have to be shut down. There has been a steel works on this site for about fifty years. Of course, many changes have been made in it during that interval.

In the process of galvanizing, the material to be treated is first dipped in a bath of dilute muriatic acid, a 3 per cent. solution in water. It is then drained and drawn through a kettle of molten zinc. The heat vaporizes the acid adhering to the material, and it is thrown off as vapor. There are hoods over each kettle which open into ventilating shafts, or "stacks," rising about twenty-five feet above the roof. Through these the acid vapor is drawn up and discharged into the atmosphere. There are four such kettles and stacks in the defendants' plant, but only two of them are generally in operation; a third is run a few weeks each year. The testimony is that all four are never in operation at the same time. The fumes thus discharged move with the wind, diffusing as they go and, being slightly heavier than air, they tend to settle.

In a concentrated form the fumes would be highly disagreeable and possibly dangerous to life if breathed for a substantial time. They never occur in this form in the defendants' plant. There is only about 1 per cent. of them in the air directly over the molten metal under the hood. As they rise they are much diluted by the air drawn up with them through the ventilating shafts and are still further diluted as they drift with the wind. The original amount of them is not large, as they come only from the small amount of the acid which adheres to the material after it is drained. As I saw them on a pleasant day with a light breeze, they appeared like a very thin bluish smoke, visible for a certain distance as they drifted with the wind away from the stack, and thereafter invisible in the air. They could be smelt slightly after they had ceased to be visible. They would never be objectionable except to leeward of the stacks. In this connection the evidence is that the prevailing winds in Clinton for most of the year are from the northerly sector. As the plaintiffs' houses are from about three hundred to about five hundred feet distant from the galvanizing plant and on the north side of it, they are most of the time to windward of the fumes. Up to this point the facts are not serious controversy.

As to the intensity of the fumes at the plaintiff's houses, and the effect of the fumes on persons, on vegetable life, and on buildings, the testimony was much in conflict. The plaintiffs and their witnesses testified that at times the fumes were very disagreeable; that they caused acute illness; that they killed trees and other growing things; and that they injured the paint and nails on the exterior of the houses, and injured or destroyed interior furnishings. Mr. Lawson, a civil engineer, who had been connected with the Clinton superintendent of streets' office, and Mr. Hamilton, who had formerly been chairman of the Clinton board of health, both testified that on occasions they had observed fumes drifting across Sterling street onto the plaintiffs' property; that the fumes were plainly visible and had a disagreeable odor and made one cough. A complaint about the fumes was made by some of these plaintiffs to the board of health a year or more ago; and from little things in the testimony of several of the defendants' witnesses it is evident that for the last three years there has been complaint by the plaintiffs about annoyance from these fumes.

The defendants' contention is that the fumes were so diluted by the time they reached the plaintiffs' houses as never to be seriously disagreeable there. Professor Gill of the Massachusetts Institute of Technology testified to pretty careful tests of the air, which he had made in the neighborhood of the plant on more than one occasion, which showed only minute traces of acid even where the fumes were sufficiently concentrated to be visible. He said that the fumes consisted principally of chlorine gas, which in extremely dilute form is not unwholesome; that it would never give paint a brown stain—of which the plaintiffs complained—nor have any effect on the paint at all; that as to persons, chlorine in such dilution as it reached the plaintiffs' houses would not be unhealthy;

that he at no time found fumes nearly as strong as are permitted under the English Factory Act. Professor Smith of the Worcester Polytechnic Institute testified that immediately over the melting kettles under the hood the fumes had a dangerous concentration; but he did not contradict Professor Gill's testimony; and he said that at the time of his examination he noticed no odor outside the plant nor anywhere around there.

The testimony coming from the plaintiffs and their families taken as a whole was greatly exaggerated and unreliable. I believe, however, that occasionally in close, damp weather with a light air from the south, the fumes from the galvanizing plant drift across the properties of certain of the plaintiffs in a very annoying concentration. I think this is true only of the houses which may be regarded as directly opposite the galvanizing plant, i. e. the houses of De Blois, Stewart, Shanbaum, and Calcia. The houses of the other plaintiffs are farther away and so screened by trees that I do not believe they ever get the fumes in a concentration which constitutes a legal nuisance. The occasions referred to are not frequent, but they do occur, and the fumes are then quite sufficient to wake the average person out of a sound sleep and make him or her decidedly uncomfortable. I am not satisfied that the fumes discolor or injure the exterior of the houses or the interior furnishings. Nor am I satisfied that they cause serious illness. While several of the plaintiffs testified to having been made seriously ill by them, no physician was called to corroborate this testimony, nor was there any evidence of experts that the fumes might cause such illnesses as the plaintiffs described. Moreover, the state board of health, which investigated this question on the complaint of some of the plaintiffs, found that the fumes were not dangerous to health. The plaintiffs also contend that the fumes killed shade and fruit trees around their houses. There are several dead trees around the De Blois house, and other trees in that immediate vicinity appear to be injuriously affected by something. Farther up Sterling street, near the Daley house, the trees and other growing things showed no signs of being injured. It appeared in evidence that there had been a leak from the gas main on that street and farther down trees had been killed from that cause. On one tree which appeared to be in an unhealthy condition I noticed many marks of borers. It is not easy to say what kills a tree; they were exposed to these fumes only on infrequent occasions; and on all the evidence I am not satisfied that the fumes seriously injured trees, shrubs, or growing plants.

The test by which the question of nuisance is to be determined is well stated in Strachan v. Beacon Oil Co., 251 Mass. 479, 146 N. E. 787, 790: "It is a matter of common knowledge that in thickly settled manufacturing communities, the atmosphere is inevitably impregnated with disagreeable odors and impurities. This is one of the annoyances and inconveniences which every one in such a neighborhood must endure. Mere discomfort caused by such conditions without injury to life or health cannot be ruled as *matter of law* (italics mine) to constitute a nuisance. Each case must depend upon its own facts and no rule can be formulated which will be applicable to all cases." Crosby, J., Strachan v. Beacon Oil Co., 251 Mass. at page 487, 146 N. E. 787, citing authorities. See, too, Downing v. Elliott, 182 Mass. 28, 29, 64 N. E. 201, and Tuttle v. Church (C. C.) 53 F. 422. On the question of fact whether the smell, smoke, or fumes of manufacturing establishments were of such character as to constitute nuisances, the decisions indicate great liberality towards industrial establishments. In Tuttle v. Church, supra, Judge Colt found that a fish-rendering plant was not a nuisance; in the Strachan Case, supra, the master found that an oil works was not; In Fay v. Whitman, 100 Mass. 76, a jury found that a slaughterhouse was not; in Wade v. Miller, 188 Mass. 6, 73 N. E. 849, 69 L. R. A. 820, a master found that a hen yard in a village was not. In the Strachan Case, supra, it was said that mere discomfort without injury to life or health could not be ruled as a matter of law to constitute a nuisance, though apparently it might have been so found as a matter of fact.

Just where the line should be drawn between, on the one side, the interests of a community in its industrial establishments which give occupation to its inhabitants and revenue in the form of taxes and in other ways, and, on the other side, individuals who are annoyed or rendered uncomfortable by the operation of such establishments, is, as the cases say, not easy to define. The question whether the defendants have done everything reasonably practicable to avoid the cause of offense is important. Reasonable care must be used to prevent annoyance and injury to other persons beyond what the fair necessities of the business require. In the present case there is no convincing evidence that the defendants have done everything commercial-

ly practicable to control the fumes. It is suggested by the plaintiffs that the fumes could, at not unreasonable expense, be turned into a tall chimney belonging to the defendants near the galvanizing plant and discharged high in the air, so that they would never float across the intervening land to the plaintiffs' houses in such concentrations as under present conditions occasionally occur. The defendants have made no satisfactory answer to this suggestion. While, as above stated, I am not satisfied that the fumes have caused physical illness, nor injured the plaintiffs' buildings or growing trees and plants, I do believe that at times they cause physical discomfort and inconvenience to an extent beyond what the plaintiffs ought reasonably to be expected to endure, unless everything commercially possible has been done to mitigate them. In other words, the property owner has the right to reasonably pure air; it devolves upon the person contaminating it to justify his action by showing the business necessity for so doing; in this case such justification has not been made out. While there are cases in which the contamination is so serious in its effects on persons or property that no business necessity justifies it, the present case is not of this extreme character. The contamination here is justifiable if unavoidable; but the necessity is not proved. On the facts as above stated I find and rule that the defendants are maintaining a nuisance.

■ I am, however, very clear that in view of the infrequent occasions on which the plaintiffs suffer from the nuisance, and on account of the great and disproportionate injury to the defendants and to the community which would be caused by an injunction preventing the operation of the steel works, no injunction ought to be granted. The inconvenience and temporary discomfort of the plaintiffs during the few occasions each year when the fumes are oppressive are greatly overbalanced by the benefits which the community receives from the presence of the plant. Newburyport Institute for Savings v. Peffer, 201 Mass. 41, at page 47, 87 N. E. 562, citing cases, Downing v. Elliott, 182 Mass. 28, 64 N. E. 201. See, too, New York City v. Pine, 185 U. S. 93, 22 S. Ct. 596, 46 L. Ed. 820. The plaintiffs recognize this and do not insist upon an injunction.

■ While the plaintiffs are not entitled to, and do not press for, an injunction against the operation of the galvanizing plant, they are entitled to have the defendants make reasonable efforts to abate the nuisance. If the defendants do not forthwith take all steps reasonably within their power to do so, the plaintiffs may move for a mandatory injunction compelling such action.

■ As to damages, they should be assessed in this proceeding. Newburyport Case, supra, pages 47, 48 of 201 Mass., 87 N. E. 562. The damages of the plaintiffs who are entitled to them, viz., De Blois, Stewart, Shanbaum, and Calcia, appear on the present evidence not to be large in amount and perhaps can be adjusted by the parties. If not, inasmuch as a good deal of the evidence on damages has already gone in on the question of liability, it will be more convenient and less expensive for the parties if I undertake the assessment instead of sending that question to a master. The case may be set down before me for this purpose.

Case to stand for further hearing in accordance with this opinion.