## CITY OF LOUISVILLE v. NATIONAL CARBIDE CORPORATION.

### No. 1375.

United States District Court
W. D. Kentucky, at Louisville.

Nov. 18, 1948.

Gilbert Burnett, City Atty., and John R. Moremen, Asst. City Atty., both of Lousiville, Ky., for plaintiff.

Hubert T. Willis and B. Hudson Milner, both of Louisville, Ky. (John A. Fulton, of Louisville, Ky., of special counsel), for defendant.

SHELBOURNE, Chief Judge.

The difficult question involved in this case is not novel. It has been many times before many Courts.

No better statement of the problem could be found than in the case of De Blois v. Bowers, D.C., 44 F.2d 621, 623—"Just where the line should be drawn between, on the one side, the interests of a community in its industrial establishments which give occupation to its inhabitants and revenue in the form of taxes and in other ways, and, on the other side, individuals who are annoyed or rendered uncomfortable by the operation of such establishments, is, as the cases say, not easy to define."

"There is no doubt" said the Supreme Court in the case of Camfield v. United States, 167 U.S. 518, 17 S.Ct. 864, 866, 42 L.Ed. 260—"of the general proposition that a man may do what he will with his own, but this right is subordinate to another, which finds expression in the familiar maxim, 'sic utere tuo ut alienum non lædas.' His right to erect what he pleases upon his own land will not justify him in maintaining a nuisance, or in carrying on a business or trade that is offensive to his neighbors."

This action, instituted July 22, 1947, by the City of Louisville, in, and removed from, the Jefferson Circuit Court, by the defendant National Carbide Corporation, is an application for an injunction, order-

ing and directing Carbide to correct and abate an alleged public nuisance which plaintiff says has existed since November 1941, when Carbide began the operation of a plant on Bells Lane in Jefferson County near the southwesterly boundary line of the City of Louisville, where it has since manufactured carbide and its by-products.

The City alleged that in the operation of the plant, Carbide caused vast quantities of carbide dust to emanate and escape in great volume, which permeated, polluted and filled the atmosphere in and near the plant and in the City of Louisville over a vast residential area in the southwesterly section of Louisville, referred to in the record sometimes as "West End", other times as "Shawneeland".

It is claimed that the carbide dust deleteriously affected the eyes and respiratory organs of persons in the area, injured their health, and so permeated the houses and places of business and assembly that the residents were compelled to and did keep their windows and doors closed, thereby causing great inconvenience and discomfort.

It was alleged that the dust so infiltrated the air in said area that the residents were deprived of the reasonable use, comfort and enjoyment of their homes and property.

The answer of Carbide admitted its alleged corporate existence and business, but denied all other allegations contained in the complaint.

The case was tried to the Court without a jury and at that time the Court and Counsel visited the plant while in operation and the Court was requested by Counsel to visit the West End and the plant at such times as convenient, for the purpose of personally observing conditions in that area, pending the period of submission.

The Carbide plant was erected in 1940 and 1941 at a cost to Carbide of approximately $5,000,000, supplemented by a Government investment of approximately $850,000. The plant is erected in a section highly industrialized and its importance at the time of its construction was of particular concern to the Government, in that it became an important link in the synthetic rubber industry so necessary in the program of preparedness for War.

The record discloses that about 1945, Carbide began to install a dust collecting system, which had entailed an additional expense of approximately $1,000,000 at the time of the trial of this case in December 1947.

Prior to 1945, the dust problem became of great concern to the residents in the West End, and was the subject of an investigation and action by the Louisville & Jefferson County Board of Health, an administrative branch of the City and County, created under Kentucky Revised Statutes—Section 212.350.

September 4, 1945, the Health Board adopted a resolution declaring that the Carbide plant was being operated in such manner as to cause vast quantities of dust to emanate and escape from its plant in great volume, which dust permeated, polluted and filled a large portion of the West End, where thousands of residences and many schools, churches and industries were located and that the use of the property by Carbide was offensive and produced such discomfort as to impair the comfortable and healthful enjoyment and value of the properties of persons of ordinary sensibilities and was affecting deleteriously the eyes, noses, ears and throats of the residents of that section.

After reciting that such conditions had been brought, time and again to the attention of Carbide, with the request that that situation be remedied, but up to that time, to no avail, the Board referred to a resolution (which has not been introduced in the evidence) alleged to have been passed in July 1944, which ordered the Company to abate the alleged nuisance, but which order was not enforced, because of the War and the urgent need for the products of the plant in the War effort. Reciting the ending of the War and the cessation of hostilities, the Board of Health, in the September 1945 resolution, declared that the emission of the dust constituted a public health nuisance, producing discomfort and impairing the comfortable and healthful enjoyment and value of the property

and seriously affecting the health of the citizens within the area.

Sections 2 and 3 of the resolution are as follows:

"Section 2. That the aforesaid public health nuisance be and the same is hereby ordered to be abated by the discontinuance of the operation of all carbide furnaces in said plant on and after midnight, 12:00 o'clock P.M. on Wednesday, September 5, 1945, said furnaces to be kept shut down until such time as the said National Carbide Corporation shall have installed and put into use machinery to and that shall eliminate the said dust nuisance.

"Section 3. That a copy of this Resolution shall be sent to the National Carbide Corporation, together with a formal order to close down its said furnaces and to cease to operate same until such time as it has taken the necessary action to eliminate said dust nuisance, as provided in Section 2 hereof."

The next meeting of the Health Board, at which the Carbide plant was discussed, is reflected by the minutes of a "Telephone Meeting" held September 7, 1945, which recites that telephone calls were made for the purpose of taking action on the situation created by the closing down of the furnaces of the National Carbide Corporation, at which the minutes recite the following action to have been taken: "Mayor Wyatt reported that of the three furnaces remaining in operation at the National Carbide Corporation on Tuesday, September 4th, 1945, two were closed down by the Company on Wednesday, September 5th and the last remaining one was shut down Friday, September 7th, 1945. In view of the complete shut down of all furnaces, Mr. Stoll, Chairman of the Louisville and Jefferson County Board of Health directed that all members of the Board be reached by telephone and all agreed that the action of the Louisville and Jefferson County Board of Health of September 4th, 1945, be for the time deferred."

The next meeting of the Board is reflected by the minutes of a meeting of September 27, 1945, at which—

"Dr. Roundtree reported on the situation at the National Carbide Corporation. He stated that one furnace is operating which is completely equipped with dust elimination apparatus and that on his visit this day, there appeared to be only a slight discharge of .dust from the stack of this furnace."

The last record of any meeting of the Health Board about which testimony is introduced is shown to have been held August 1, 1947. The minutes of that meeting are as follows:

"Hearing on Carbide Situation

Dr. Phair announced that he had written to the twenty-one physicians in the West End who had signed a petition to the Mayor, asking them to attend a hearing before the Board of Health to outline their reasons for stating that the Carbide dust is a menace to the Health of the people living in that area. He stated that only five of the twenty-one had replied; one stating that he could not attend because of a recent operation and four stating that they would attend.

It was decided that this hearing would be only for the testimony of these physisians and not for other testimony. Five physicians have been appointed by the Jefferson County Medical Society to serve as consultants to the Board of Health and will attend in that capacity.

There will be no decision on the part of the Board of Health at this hearing. Hearings will be taken and the matter taken under advisement and a decision given at a later date.

Complaint of Mayor Taylor

Mayor Taylor complained that he had on numerous occasions made reports and requests to the Sanitation Division of the Preventive Service of the Board of Health which had not been carried out. He would like an investigation of this and a report made to his office of the outcome.

Adjourned for Hearing at 4 P.M.

After the hearing the members of the Board of Health reconvened and it was decided that Dr. Phair will ask the group of consultants to file a report with the Board of Health of their opinions on the case. A meeting of the Board of Health will be called in approximately two weeks at

which time the members of the Board will draft a reply.

On August 7, 1947, the Committee from the Jefferson County Medical Society met and drafted a reply which is attached to the minutes of the meeting."

No representative of the Kentucky State Board of Health or of the Louisville and Jefferson County Board of Health has been called as a witness in this case.

Section 212.370 Revised Statutes provides that the Health Board therein created in Counties having a city of the first class shall have, except as otherwise provided by law, exclusive control and operation, under the Acts of the General Assembly, of the ordinances of the legislative bodies of the municipalities in said county, the orders and resolutions of the Fiscal Court of the County, the regulations of the State Board of Health and of the City and County Boards of Health, of all matters affecting public health, including the enforcement of all laws and regulations affecting public health.

Section 212.620 of the Statute is as follows:

"(1) Whenever any such aforesaid nuisance, source of filth, or cause or probable cause of sickness, shall be found by the board to exist on any private or public property within such county, including the municipalities therein, in violation of said laws or regulations, which said violation injuriously affects or may affect the health of the residents of said county or section thereof, the board shall have the power and authority to order in writing the owner or occupant or user thereof, by appropriate action, at the expense of such owner, occupant or user, to correct and remove said nuisance, source of filth, or cause or probable cause of sickness, within twenty-four hours or within such reasonable time as the board may order.

"(2) In case of a failure on the part of any person, firm or corporation, or persons, firms or corporations, to comply with any lawful order of the board, or with process, or in case of the refusal of any witness to testify concerning any matter on which he may be lawfully interrogated, the circuit court or a judge thereof, having jurisdiction in such county, may, on application of the board or of any member thereof, compel obedience by proceedings for contempt as in the case of disobedience of the requirements of a subpoena issued from such a court, or a refusal to testify therein."

Subsequent sections of the Statute provide penalties for violation of any health regulation promulgated by the Board or of any order made by the Board directing the abatement of a nuisance, source of filth, or cause or probable cause of sickness.

The apparent abandonment on the part of the Health Board of any effort to enforce a closing down of the plant under the powers possessed by the Board under the Statutes, supra, and the failure of the officials of the Board of Health to testify in this case, indicate to the Court a change of opinion on the part of the Board, especially in view of the proceedings in that body as reflected by the minutes of the meetings beginning September 7, 1945. This inference, amplified by a lack of proof by plaintiff showing a similarity in the analyses in the effluent of the plant with the dust claimed to permeate the homes in the residential section of the West End, is most significant.

### Findings of Fact.

1. The City of Louisville is a municipal corporation, classified by the Kentucky Statutes, as a city of the first class, and is a citizen and resident of the State of Kentucky.

National Carbide Corporation is a corporation created and organized under the laws of the State of Delaware and a citizen and resident of that State. The matter in controversy in this action exceeds in amount and value the sum of $3,000 exclusive of costs and interest.

2. The City has a legal right to institute this suit and to seek for the benefit of its citizens an injunction to abate a nuisance inimicable to the health and reasonable and comfortable occupancy of the homes of its citizens.

3. In the year 1941, as a part of the program of preparedness for War, a variety of plants was established in and near the City of Louisville, whose ulti-

mate correlated purpose was to produce synthetic rubber. Carbide was one of such industries and was built by the National Carbide Corporation on a tract of land located about a mile and a half from the southwesterly boundary of the City in an area since zoned for industry.

4. The plant constructed was intended to be used and was used for the manufacture of calcium carbide. Large containers, open at the top, having the shape of a bowl, were erected as furnaces. They were connected with each other by a platform on which the workmen stood while filling the containers with calcium oxide and petroleum coke. Electrodes were lowered into this mixture so that with the application of electricity an arc was formed with a dead electrode producing intense heat, the reaction from which resulted in calcium carbide. The furnace or crucible was covered with a roof, ventilated at the top so as to permit the escape of steam, fumes, clouds of vapor and dust.

The molten carbide is removed from the lower part of the furnace or crucible by tapping. A hot electrode is inserted through a vent in the lower part of the furnace so as to melt the outer hardened layer of carbide and through this vent, the molten carbide flows into small gondolas, operated upon rails.

In the tapping process, large quantities of dust, vapor and fumes, which arise from the tapping into the building, pass out into the air through the ventilators in the top of the building or into a ventilated chimney, and thence into the air above.

5. Beginning in 1943, a program of research was instituted, out of which plans were formulated to better control the dust emitted from the plant.

In the year 1945, an attempt was made partially to inclose the furnaces so as to draw off the gases and dust through ducts through which the gases and dust passed through collecting equipment called rotoclones. As rapidly after September 23, 1945, as this work could be completed upon each of the furnaces, operation was resumed. In addition to the dust collecting apparatus and rotoclones, a large stack 250 feet in height was erected. The cost of the equipment and installations was approximately $1,000,000.

6. No evidence was heard in this case from which it could be concluded that any harmful effects to the health of the employees at Carbide was caused by dust, fumes or vapors arising from or caused by the manufacture of carbide. Some of these employees had worked at this and similar plants for as long as eighteen years.

7. The calcium contained in the effluent from the Carbide plant is in the form of calcium carbonate, shown by experts to be a non-toxic compound, of which blackboard chalk is a common example. There is not sufficient evidence in this case from which it could be concluded that the dust concentration from the Carbide plant is a health menace or a nuisance.

The many chemical analyses and tests of dust samples collected in the West End, all contain a high percentage of silica not traceable to the effluent from the Carbide plant.

Correspondingly, none of the analyses reflect a sufficiently high percentage of calcium to indicate that such samples came from the Carbide plant, as distinguished from the many industrial plants using coal as fuel and in which the silica content was high and the calcium content low.

There is a marked similarity in the analyses of the many dust samples taken from parts of the City other than the West End and the area of the plant. Such analyses bear great similarity to dust samples found in other industrial cities where no carbide plant is located.

8. The evidence in this case is not sufficient to establish a causal relationship between operations of the National Carbide plant and the dust conditions complained of in the West End.

9. It was stated by Counsel for Carbide that it did not have the right to erect or use "a closed type furnace" because that type was covered by patents closely held and therefore Carbide resorted to the use of the open type furnace not covered by a patent. There is no proof that the operation with a closed type furnace produces less dust, less vapors or dirt; in fact

there is no evidence concerning the process employed in the so-called closed type furnace.

### Conclusions of Law.

■ I. This Court has jurisdiction of the subject matter and of the parties.

■ II. The health, comfort, convenience, and common welfare of its citizens is of such concern to a municipal corporation as that it is not only the right, but the duty of the city, to abate nuisances and its police power for that purpose is sufficient. Nourse v. City of Russellville, 257 Ky. 525, 78 S.W.2d 761. "When a plain and adequate remedy at law cannot be obtained, the power of a court of equity to abate a private nuisance which is destructive of the property of a complainant, or renders its use and occupation physically uncomfortable, is no longer questionable. The jurisdiction of the court, in such cases, is predicated upon the broad ground of preventing irreparable injury, interminable litigation, a multiciplicity of actions, and for the protection of rights." Sellers v. Parvis & Williams Co., C.C.Del., 30 F. 164, 165.

■ The Supreme Court has thus defined a nuisance in the case of Baltimore & Potomac R. Co. v. Fifth Baptist Church, 108 U.S. 317, 2 S.Ct. 719, 726, 27 L.Ed. 739: "That is a nuisance which annoys and disturbs one in the possession of his property, rendering its ordinary use or occupation physically uncomfortable to him. For such annoyance and discomfort the courts of law will afford redress by giving damages against the wrong-doer, and when the cause of the annoyance and discomfort are continuous, courts of equity will interfere and restrain the nuisance."

In 1880, the Court of Appeals of Kentucky in the case of Louisville Coffin Co. v. Warren, 78 Ky. 400, considered the right of citizens to obtain an injunction because of smoke and soot alleged to have been thrown upon their property by the plant of the Louisville Coffin Company. The plant of the Louisville Coffin Company, was located within the square bounded by Walnut & Third, Chestnut & Fourth Streets in the City of Louisville. The plaintiff Warren's restaurant occupied the corner of Fourth & Walnut Streets.

It was contended that from the factory, a column of smoke, soot and burning embers poured from the smoke-stack, frequently carrying soot, cinders and smoke over the premises of the plaintiffs, enveloping their windows and doors and rendering the atmosphere unwholesome for respiration; endangering their buildings. by fire, making their homes less valuable for rental purposes and greatly increasing the insurance rates. Judge Pryor, writing for the Court said—"One living in a city must necessarily submit to the annoyances which are incidental to city life. It must be recollected that manufacturing establishments are necessary and indispensable to the growth and prosperity of every city, and while cleanliness and beauty of that part of a city adorned by costly edifices may be marred by the erection of the foundry or the machine shop, and the comforts of life by the hum and noise of machinery, still the manufacturing interest upon which its prosperity depends, requires protection and individual comfort must yield to the public good."

In the same opinion, it was said—"This factory cannot be regarded a greater nuisance than the other manufacturing establishments within the city using steam power and having smoke-stacks attached. to their buildings."

Many opinions have followed the Louisville Coffin Co. case and in 1936, in the case of Kentucky Ohio Gas Co. v. Bowling, 264 Ky. 470, 95 S.W.2d 1, 4, the Kentucky Court of Appeals quoted with approval the following excerpt from the case of Powell v. Bentley & Gerwig Furniture Co., 34 W.Va. 804, 12 S.E. 1085, 12 L.R.A. 53—"In the nature of things and of society, it is not reasonable that every annoyance should constitute an injury such as the law will remedy or prevent. One may therefore make a reasonable use of his right, though it may create some annoyance or inconvenience to his neighbor. * * * According to our settled notions. and habits, there are convenient places, one for the home, one for the factory, but, as often happens, the two must be so near each other as to cause some inconvenience.

The law cannot take notice of such inconvenience, if slight or reasonable, all things considered, but applies the common sense doctrine that the parties must give and take, live and let live."

The evidence in this case is not sufficient to authorize the conclusion that there is any real injury or threat of injury to the health of the residents of the West End or Shawneeland, nor is the evidence sufficient to justify the Court in requiring the defendant to cease operating its plant upon the theory that it is the prime contributor to the dust and smoke which invades the homes and, to some extent, does interfere with their comfortable occupancy.

The proof is not sufficient to justify the conclusion that the Carbide plant contributes more to this condition than any of the many other plants, whose effluent is discharged into the air in the same general vicinity.

III. The effluent from the National Carbide plant is not discharged in such quantities, nor shown to be of such quality, as to constitute a public nuisance as a matter of law.

IV. The expenditure in money and effort made by the Carbide Corporation since 1945, to eliminate the dust and smoke from its plant, reasonably justifies the conclusion that that effort and the expenditure of money will be continued. Such a conclusion is reasonable from the testimony of the officials of the company, and while the Court does not question the sincerity, of the many plaintiffs who testified in this action, in their belief that the effluent of the Carbide plant has seriously decreased the comfortable enjoyment of their homes, they can be but pointed to the many decisions of the Courts denying injunctive relief upon the well recognized principle that—"* * * in thickly settled manufacturing communities, the atmosphere is inevitably impregnated with disagreeable odors and impurities. This is one of the annoyances and inconveniences which every one in such a neighborhood must endure. Mere discomfort caused by such conditions without injury to life or health cannot be ruled as matter of law to consti-

tute a nuisance." Strachan v. Beacon Oil Co., 251 Mass. 479, 146 N.E. 787, 790."

In the last case referred to, the Court further said: "The question whether the defendants have done everything reasonably practicable to avoid the cause of offense is important."

The expenditure of substantially $1,000,-000 within a period of approximately sixteen months, together with the evidence of the continued effort of the Carbide Corporation to better control the offal of its plant, seem to measure up to this rule of law, recognizing such a bona fide effort.

It is therefore concluded that the plaintiff is not at this time, and upon the testimony heard in this case, entitled to the injunctive relief sought and judgment may be submitted dismissing plaintiff's petition, without prejudice, however, to the right of the plaintiff to reopen its application here made, when it is felt substantial evidence can be adduced showing deleterious effects upon the health of the residents of the community and a more logical causal connection between the situation complained of in the West End and the effluent from the Carbide plant, as distinguished from the many other industries located in the same vicinity.